# UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| ------------------------------------------------------- ) | |
| ROBIN SHAW ) | |
| *(p/k/a Robert Hilderman),* ) | |
|     *an individual* ) | |
|         Plaintiff, ) | |
| vs. ) | Case No. |
| ) | |
| HARVEST FOUNDATION, INC. ) | |
| *(d/b/a "Anchor Academy"),* ) | |
|     *a nonprofit corporation;* ) | |
| VANDUSER GIN COMPANY, ) | |
|     *a corporation*; ) | |
| DENNIS L. MCELWRATH, ) | |
|     *an individual*; ) | |
| TREVOR SPENCER, ) | |
|     *an individual*; ) | |
| WALTER HILDERMAN IV, ) | |
|     *an individual*; ) | |
| KATHERINE HILDERMAN ) | |
| *(p/k/a Katherine Halloran),* ) | |
|     *an individual*; ) | |
|         Defendants. ) | |
| ------------------------------------------------------- ) | |

## CIVIL COMPLAINT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................3

PARTIES ...............................................................................................................4

VENUE .................................................................................................................5

JURISDICTION .....................................................................................................6

FACTUAL ALLEGATIONS ....................................................................................6

    I.     Labor Trafficking ................................................................. 6

        A. Introduction – The "Anchor Academy" Venture ...................................6

        B. Background (Havre Air Force Base) ...................................................10

        C. Anchor Baptist Church ......................................................................12

        D. Harvest Foundation, Inc. ...................................................................13

        E. Vanduser Gin Company .....................................................................15

        F. Other Agricultural and Miscellaneous Enterprises ...........................17

    II.    A System of Force and Coercion ......................................... 17

        A. "Orientation" .....................................................................................18

        B. "Demerits" ........................................................................................21

        C. "Character Enhancement Training" ....................................................22

        D. "Peanut Butter" .................................................................................24

    III.   Obstruction and Interference with Enforcement ............ 25

        A. Background ........................................................................................25

        B. Plaintiff's Police Report ....................................................................28

        C. Abuse of Legal Process .....................................................................29

        E. McKinney-Vento Act Homeless Youth Liaison ................................34

        F. Witness Tampering .............................................................................35

CAUSES OF ACTION ...........................................................................................41

PRAYER FOR RELIEF ..........................................................................................47

2

## PRELIMINARY STATEMENT

*"The root cause of human trafficking is traffickers."*
— Amb. JOHN COTTON RICHMOND

This is a civil action arising under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, and Masha's Law, 18 U.S.C. § 2255, for violations and attempted violations of 18 U.S.C. §§ 1581 (peonage; obstructing enforcement); 1584 (involuntary servitude; obstructing enforcement); 1589 (forced labor); 1590 (trafficking with respect to peonage, involuntary servitude, or forced labor; obstructing enforcement); and 18 U.S.C. § 1593A (benefiting financially from peonage and trafficking in persons) committed against plaintiff at the hands of defendants while plaintiff was a child.

Plaintiff Robin Shaw, appearing *pro se*, hereby brings this action against defendants Harvest Foundation Inc. d/b/a Anchor Academy, a nonprofit corporation; Vanduser Gin Company, a corporation; Dennis L. McElwrath, an individual; Trevor Spencer, an individual; Walter Hilderman IV, an individual; and Katherine Hilderman, an individual;

With innocent purpose, and on information, knowledge, or belief, Plaintiff sets forth as follows:

3

## PARTIES

1. Robin Shaw ("Plaintiff") is an individual who primarily resides in the Central District of Illinois. Plaintiff was born in August of 1998. For a substantial portion of the time the events or omissions giving rise to these claims occurred, Plaintiff's public and legal name was Robert Hilderman.

2. Defendant Dennis L. McElwrath ("Dennis Jr.") is an individual who primarily resides in the Eastern District of Missouri, Southeastern Division.

3. Defendant Trevor Spencer ("Spencer") is an individual who primarily resides in the Middle District of Pennsylvania. For a substantial portion of the time the events or omissions giving rise to these claims occurred, Spencer's primary residence was in the Eastern District of Missouri, Southeastern Division, where he maintains a secondary address to this day.

4. Defendant Walter Hilderman IV ("Hilderman") is an individual who primarily resides in the Eastern District of Missouri, Eastern Division. Hilderman is the genetic father of Plaintiff, and at all times the events or omissions giving rise to these claims occurred, Hilderman was Plaintiff's legal parent subject to a child custody order.

5. Defendant Katherine Hilderman (referred to herein as "Halloran") is an individual who primarily resides in the Eastern District of Missouri, Eastern Division. At all times the events or omissions giving rise to these claims occurred, Hilderman and

4

Halloran were married and resided together, and Halloran's public and legal name was Katherine Halloran.

6.    Defendant Harvest Foundation, Inc. ("HFI") is a nonprofit corporation organized under the laws of Missouri, with its principal place of business located in the Eastern District of Missouri, Southeastern Division. On or about April 2, 2019, HFI registered unto itself the DBA/fictitious name "Anchor Academy." At all times the events or omissions giving rise to these claims occurred, Dennis Jr. was the President of HFI and remains so to this day.

7.    Defendant Vanduser Gin Company ("VGC") is a corporation organized under the laws of Missouri, with its principal place of business located in the Eastern District of Missouri, Southeastern Division. Dennis Jr. has been the President of VGC since no later than October 21, 2010 and at all times the events or omissions giving rise to Plaintiff's claims occurred.

## VENUE

8.    This Court is the proper venue for these claims pursuant to 28 U.S.C. § 1391(b)(2) and E.D.Mo. L.R. 2.07(B)(2) because a substantial part of the events or omissions giving rise to these claims occurred in the Eastern District of Missouri and at least one defendant resides in the Eastern Division.

## JURISDICTION

9. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343.

10. This Court has personal jurisdiction over all defendants pursuant to Federal Rule of Civil Procedure 4(k)(1)(C) and the nationwide service of process provision of 18 U.S.C. § 2255.

11. This Court has general jurisdiction over Dennis L. McElwrath, Walter Hilderman IV, and Katherine Hilderman because they all reside in the Eastern District of Missouri.

12. This Court has general jurisdiction over Harvest Foundation Inc. and Vanduser Gin Company because they both are Missouri entities and their principal places of business are located in the Eastern District of Missouri.

13. This Court has specific jurisdiction over all defendants because a substantial part of the events or omissions giving rise to these claims occurred in the Eastern District of Missouri.

## FACTUAL ALLEGATIONS

### I. Labor Trafficking

#### A. Introduction – The "Anchor Academy" Venture

14. Defendants Dennis L. McElwrath ("Dennis Jr.) and Trevor Spencer ("Spencer") together conceived, directed, and participated in a common undertaking that

6

recruited, obtained, and harbored children. From the beginning, Dennis Jr. and Spencer publicly referred to this enterprise as "Anchor Academy." In 2019, after the corpus of events alleged in this Complaint had passed, Dennis Jr. registered the DBA/fictitious name "Anchor Academy" on behalf of Harvest Foundation, Inc.

15. As used herein, "Anchor Academy" or "the Anchor Academy venture" refers to the whole enterprise that Dennis Jr. and Spencer together conceived for the purpose of recruiting, obtaining, and harboring children. Anchor Academy's operations have spanned many years and multiple States.

16. At all times the events or omissions giving rise to this claim occurred, Anchor Academy was a trafficking venture within the scope of 18 U.S.C. § 1590(a), and includes – as knowing participants in a conspiracy to recruit, obtain, and harbor children for the purpose of obtaining their forced labor – defendants Dennis Jr., Spencer, HFI, certain unnamed employees of HFI (hereinafter, "Staff"), and numerous other unknown or unnamed individuals or entities.

17. To this end, on or about August 8, 2005, Dennis Jr. incorporated defendant Harvest Foundation, Inc. ("HFI") (previously known as "The Reclamation Company") as a 501(c)(3) nonprofit corporation under the laws of Missouri. In its Articles of Incorporation, Dennis Jr. affirmed, "[Harvest Foundation, Inc.] is formed for the purposes of generating revenues to assist ministries providing programs for troubled youth in the United States of America, including providing education,

skilled training, food, clothing, shelter, and social skills, and all other legal powers permitted a nonprofit corporation."

18.    Prior to December, 2006, Dennis Jr. and HFI contracted with the then-owners of defendant Vanduser Gin Company ("VGC") to provide individuals in the care of HFI for labor in VGC's cotton ginning facility in the village of Vanduser, Missouri.

19.    On or about August 15, 2007, a local television station reported the following:

> A small southeast Missouri town prepares for a population boost, but these aren't your average citizens moving in.
>
> The Anchor Academy describes itself as a faith-based academy reaching out to troubled young men.
>
> Next month, directors plan on moving students to Vanduser after shutting down their school in Havre, Montana.
>
> Vanduser, Missouri has a population of 217.
>
> The cotton gin is the biggest employer, so it stands to reason it would help boost Vanduser's population in a big way.
>
> "We ginned more cotton last year than we've ever ginned.  The young boys did a man's job," Suzy Johnson said.  Her husband owns the gin.
>
> Those young boys began working at the gin, to raise money for the Anchor Academy.
>
> Program Director Dennis McElwrath is a native of southeast Missouri.
>
> Turns out he was looking for a new place to "drop anchor" as he travelled with the boys.
>
> "Our program reaches out to many types of struggling youth would it be abandoned by their parents or struggling with drugs, alcohol rebellion that type of thing," McElwrath said.
>
> With a donated church building at their disposal, the Anchor crew has already built on additions to house the students.
>
> ….

8

CJ Cassidy, *Anchor Academy Moving to Vanduser*, KFVS-TV (Aug. 15, 2007, at 20:22 CDT, updated Aug. 15, 2007, at 23:39 CDT), https://www.kfvs12.com/story/6937614/anchor-academy-moving-to-vanduser/ [https://perma.cc/RNZ7-DVKT] (last visited May 17, 2026).

20.    On or about August 16, 2014, defendant Walter Hilderman IV ("Hilderman") transferred Plaintiff to the care and custody of Anchor Academy. Plaintiff had just reached the age of 16. At all times Plaintiff was in the possession of Anchor Academy, Plaintiff was 16 years old and a child.

21.    Plaintiff was transferred, and Anchor Academy obtained him, for the purpose of forcibly employing Plaintiff in labor, including oppressive child labor.

22.    To wit, Plaintiff labored as an operator or a helper in occupations particularly hazardous or detrimental to the wellbeing of children. The occupations Plaintiff participated in included the operation of power-driven saws, the operation of balers designed and used to process materials other than paper, the operation of power-driven woodworking machines, and roofing operations.

23.    To effect Plaintiff's labor, Dennis Jr. and Spencer formulized a system of violence, restraint, and other adversative methods (hereinafter, a "system of force and coercion"). At no time did Plaintiff consent to perform labor for the benefit of Anchor Academy, nor any of its individual members or associates.

24. When Hilderman initially transferred Plaintiff to Anchor Academy's possession, he knew or was recklessly indifferent to the fact that Anchor Academy was a trafficking venture. In contemporaneous digital communications with Plaintiff's genetic mother, Hilderman expressed his desire to offload the responsibility of caring for Plaintiff in a cost-effective ("cheap") manner.

25. After Hilderman initially transferred Plaintiff to Anchor Academy's possession, after a few months had passed, Hilderman repossessed Plaintiff for a period of approximately 72 hours. After which, Hilderman transferred Plaintiff back to Anchor Academy's possession being sufficiently informed by Plaintiff to know it was a trafficking venture. After a few more months, Hilderman again repossessed Plaintiff, for a period of approximately 120 hours, and again transferred Plaintiff back to Anchor Academy's possession being sufficiently informed by Plaintiff to know it was a trafficking venture.

26. In July of 2015, Hilderman permanently removed Plaintiff from Anchor Academy's possession. Hilderman then immediately obtained Plaintiff's labor for his own commercial enterprises under threat of returning Plaintiff to Anchor Academy's possession.

### B. Background (Havre Air Force Base)

27. Anchor Academy has operated with a consistent *modus operandi* since no later than August of 2000.

28. Prior to relocating to Missouri, Dennis Jr. and Spencer harbored children as young as 13 years old in the vacant Havre Air Force Station. Havre Air Force Station is a military-designated Formerly Used Defense Site decommissioned in 1979.

29. On March 15, 2001, Tom Laceky, a journalist with the Associated Press, published the following in a local newspaper:

> Church-based boys home may be forced to move.
>
> ….
>
> [M]oney troubles may force Anchor Academy out of the old Air Force radar base it thought would be home. Even if it leaves, big debts could follow it.
>
> It has spent thousands of dollars repairing and renovating the long-empty buildings and has thousands more in unpaid bills. The parent church group could wind up liable for thousands more — possibly $100,000 — to clean up heating oil that spilled in January.
>
> The home is a branch of Roloff Homes, operated by the People's Baptist Church of Corpus Christi, Texas. Dennis [L.] McElwrath, who ran one of the homes there, bused about 30 boys to the old radar base in Maiden Valley northeast of Lewistown last August.
>
> ….
>
> [Dennis L.] McElwrath had an oral agreement with Lewistown businessman George Berg to buy the radar base, but Berg filed for bankruptcy months before McElwrath arrived. Assuming he would soon own the place anyway, McElwrath began an enthusiastic construction project — until the state Commerce Department and the bankruptcy court ordered him to stop.
>
> The interrupted projects include a replacement for the antiquated sewer system. Boys and staff are using portable toilets that McElwrath moved indoors — violating health regulations.
>
> ….

11

Tom Laceky, *Good intentions gone wrong*, Independent Record (Mar. 15, 2001), https://helenair.com/news/state-regional/good-intentions-gone-wrong/article_c8cf2bc1-ebd5-5642-b664-ecd0687baa71.html (last visited May 17, 2026).

30. While Dennis Jr. litigated his adverse possession interest in Havre Air Force Base in the U.S. Bankruptcy Court for the District of Montana, the Anchor Academy venture continued to recruit, obtain, and harbor children for use as involuntary laborers.

31. Using a system of force and coercion, Anchor Academy obtained the labor of children to improve the hazardous property they were occupying. Dennis Jr. cited these improvements as evidence of rightful possession.

### C. Anchor Baptist Church

32. The village of Vanduser is an isolated community in Scott County, Missouri. In 2000, Vanduser's census was about 217 persons; in 2010, about 267 persons; in 2020, about 183 persons. Vanduser is no less than 12 road-miles from the nearest town with more than 1,000 persons (Sikeston, Missouri).

33. By 2014, Anchor Academy had constructed a facility in Vanduser (hereinafter, the "705 Vanduser facility") to shelter Dennis Jr., some Staff, and the adult and child workers Anchor Academy obtained and harbored. This facility had been tacked onto the structure of a church-style building that was preexisting when Anchor Academy acquired possession of the lot.

34. On that same lot, near Vanduser's main intersection, Anchor Academy posted a sign that read, "Anchor Baptist Church."

35. "Anchor Baptist Church" was a performance intended to obfuscate Anchor Academy's nature as a trafficking venture. To this end, Spencer played the role of a pastor and would regularly host religious services in the original church building. In so doing, Spencer solicitated valuable donations from members of the local community on behalf of Anchor Academy and kept some portion of these proceeds for himself.

36. Dennis Jr. and Spencer appropriated Plaintiff's reputation and likeness to falsely represent to the local community that Plaintiff was "troubled," and that Plaintiff struggled with alcohol and drug use. These representations were used to solicit valuable donations on behalf of "Anchor Academy" which benefited Dennis Jr., Spencer, and other members of the Anchor Academy venture.

37. By means of a system of force and coercion, Anchor Academy forced Plaintiff to labor in service of "Anchor Baptist Church." This labor included landscaping and otherwise maintaining the lot, cleaning and repairing the church building, and participating in the production of religious services.

### D. Harvest Foundation, Inc.

38. While Plaintiff was in the possession of Anchor Academy, on the other side of the 705 Vanduser facility from the "Anchor Baptist Church" sign, near an addition that

13

served as a dormitory for Dennis Jr., some Staff, and the adult and child workers Anchor Academy obtained and harbored, was a sign that read "Anchor Academy." This same sign had followed Dennis Jr. and Spencer since at least their time at Havre Air Force Station.

39. In HFI's 2015 public tax-exempt income filing, HFI affirmed, "During the year[,] 25 young men were housed, 4 residents received diploma's [sic], 5 received HiSet [sic] and 1 young man went to college. All residents are learning job skills through various community projects. Some projects are benefit projects." HFI claimed an expense of $463,086 for these accomplishments.

40. On that same form, HFI stated it had employed 47 individuals in calendar year 2015. HFI included Plaintiff as an employee in that count.

41. By means of a system of force and coercion, Anchor Academy forced Plaintiff to labor in service of HFI. This labor included preparing over 100 meals for HFI's dormitory; processing all the dormitory's soiled laundry for no less than three months; and maintaining HFI's real estate assets, including landscaping the lot and cleaning and repairing the 705 Vanduser facility.

42. At some point after Plaintiff had been permanently removed from the possession of the Anchor Academy venture, HFI mailed Plaintiff a check, from its own account, for about $2,521. This represents the full amount of monetary compensation Plaintiff received for all of the work Plaintiff performed while in the

14

possession of Anchor Academy.

43. HFI recorded Plaintiff's costs of living, including the cost of medical and hygiene supplies and "tuition" expenses, and applied it as a debt to Plaintiff, which they subtracted from Plaintiff's final compensation.

### E. Vanduser Gin Company

44. VGC is a corporation which was organized under the laws of Missouri in 1940, and it remains in Good Standing to this day. VGC's principal place of business is an industrial cotton ginning factory (hereinafter, the "801 Hamilton factory") located approximately 300 meters from the 705 Vanduser facility.

45. In 2010, Dennis Jr. purchased an ownership stake in VGC and Spencer formed "Marathon Training Academy LLC," a Missouri Limited Liability Company. These interests were financed, at least in part, by revenues generated from forced labor obtained by Anchor Academy.

46. By means of a system of force and coercion, Anchor Academy forced Plaintiff to labor in service of VGC.

47. During the cotton harvesting season in the winter of 2014-2015, Plaintiff was forced to work for 60 hours per week in VGC's 801 Hamilton factory for approximately ten weeks. Plaintiff worked five, twelve-hour overnight shifts per week during this period.

48.    While the ginning facility was operating, Plaintiff was responsible for keeping the facility clear of dust. On documents, Plaintiff was identified as VGC's "Quality Control and Safety Manager."

49.    The ginning machines operated by VGC were saw-type machines which use an assembly of serrated blades to pull cotton fibers from the cotton seed. In the process, VGC's machines would emit cotton fiber into the air. As quickly as this carpet of fiber accumulated on every surface, Plaintiff was tasked with collecting it using brooms and pressurized air and recycling it. Plaintiff was also cross trained in other roles, including tying pressurized cotton bales with graphene rods.

50.    Plaintiff inhaled a large amount of cotton – both from the ambient air while the ginning machines were operating and from collecting cotton dust for recycling – which irritated Plaintiff's preexisting asthma condition. As a result, Plaintiff frequently experienced bronchial inflammation and asthma attacks that were so severe that Plaintiff was unable to remain standing.

51.    VGC did not provide Plaintiff with adequate respiratory protection materials, and often even basic facemasks were not available save for Plaintiff's own shirt. As a result, Plaintiff's work at VGC measurably damaged his lungs.

52.    In the non-ginning season, Plaintiff was tasked with performing various maintenances on the ginning equipment. This labor included sandblasting and repainting VGC's trucks, and arc welding damaged gin pipes.

16

### F. Other Agricultural and Miscellaneous Enterprises

53. By means of a system of force and coercion, Anchor Academy provided Plaintiff's involuntary labor to numerous other agricultural enterprises, many of whom contracted with VGC for the ginning of their cotton crop. This labor included manually de-weeding commercial crop fields which directly exposed Plaintiff to large dosages of high-risk chemicals and caused severe musculoskeletal injury which persisted for many years.

54. By means of a system of force and coercion, Anchor Academy obtained and provided Plaintiff involuntary labor in furtherance of numerous other profitable endeavors. This labor included cleaning and staging a Staff member's home for resale, remodeling and cleaning other local homes and conference centers, collecting scrap for resale or reuse, and repairing goods.

### II.    A System of Force and Coercion

55. From the first moment Plaintiff was in Anchor Academy's possession, Dennis Jr., Spencer, and Staff implemented a system of force and coercion to effect control of Plaintiff's every action.

56. This system of force and coercion was conceived by Dennis Jr. and Spencer together, and consisted of *ad hoc* cruelties and a formulized set of adversative methods, escalatory violences, and physical restraint.

17

## A. "Orientation"

57. A high-control environment was maintained in the first place through the implementation of a worker-pairing system, wherein all newly obtained workers (called "Students") were paired with another worker (called a "Guide"). This Guide-Student system was called "Orientation," though "Student" status was not limited to only newly obtained workers.

58. While in Orientation, Students were subject to the direct control and 24/7 supervision of their Guide. This included the "five-foot rule," wherein a Student was forbidden from wandering outside a five-foot radius of their Guide without the Guide's permission and never outside the same room without permission from Staff. This rule included bathroom time, and all hours of day and night.

59. When Plaintiff was transferred to the possession of Anchor Academy, Plaintiff was immediately assigned to a Guide who, alongside a member of Staff, strip-searched Plaintiff to full nudity; forced Plaintiff to shower without privacy; searched all Plaintiff's possessions for "contraband," which included all digital devices, postage stamps, and cash equivalents; and permanently confiscated the same.

60. Guides were made responsible for the actions of their assigned Student(s), and Guides were likewise subordinate to the control and supervision of other elevated workers (called "Crew Leaders"). Accordingly, the failure of a Guide to record and bring to end the infractions of their assigned Student(s) would be held as an

18

infraction against both the offending Student and the Guide.

61. To aid a Guide in bringing infractions to an end, a particular method was developed to force compliance (hereinafter, the "'Just Say Alright' method")

    a. First, a Guide would issue a command to act or abstain from some act, followed by the instruction to "Just Say, 'Alright.'"

    b. If the Student's response was anything but saying "alright," then saying nothing and executing the primary command, the Guide would repeat the instruction to "Just Say, 'Alright.'"

    c. If the Student still failed to comply, the Guide (or Crew Leader, as called upon) would lift the Student and throw them on their side onto the floor. This practice was called "slamming." The overwhelming majority of Students Plaintiff saw 'slammed' immediately said "alright" and complied without further escalation.

    d. If the Student defended themself from their Guide's assault, then the Guide could, at their discretion, yell out "Green Light!" whereby anyone in the vicinity could physically assault the Student as a group until the Student complied.

62. Dennis Jr. and Spencer together conceived the "Just Say Alright" method and participated in its implementation while Plaintiff was in Anchor Academy's possession. Spencer, who was a successful social media entrepreneur, influenced

the linguistic idiosyncrasies of the method. Dennis Jr., who controlled the Guide-Student pairings, deliberately paired the most aggressive and domineering Guides with the most physically defiant workers.

63.    In one event, Plaintiff observed another worker, who was a child, refuse to say "alright" when instructed by their Guide. The Guide then 'slammed' the worker by throwing them sideways onto the floor. In response, the worker grabbed a pair of nail-clippers and held the extended one-inch nailfile out like a weapon. Seeing that, a member of Staff who was in the room yelled out "Green Light!" and a half-dozen other workers and the Staff member together battered the worker until he said "alright" and was disarmed.

64.    As a Student, Single, Guide, and Crew Leader, Plaintiff was subjected to, and subjected other adult and child workers to, the Just Say Alright method. Plaintiff observed numerous acts of physical violence carried out in this manner, including for refusal to perform labor.

65.    Dennis Jr. held Plaintiff in "Student" status for about 30 days. After some time, Dennis Jr. assigned Plaintiff to be a Guide and Crew Leader in relation to a set of adult and child workers. In one instance, Plaintiff was assigned as a Guide to an adult worker who had been in "Student" status for more than 50 weeks of the preceding year

## B. "Demerits"

66. Infractions were recorded by Guides and Crew Leaders on forms printed by HFI and provided by Staff.

67. These infractions (called "Demerits") were standardized as a set about two dozen definitions, which were printed on a laminated "Guide Card" distributed to Guides and Crew Leaders. These definitions consisted entirely of 1-to-4-word titles, such as "Forbidden Area," "Disrespect to God," "Disrespect to Staff," "Disrespect to Authority," "Disobedience," and "Lateness," which could be applied to virtually any act of noncompliance. Each definition was assigned a numerical severity value (called "points").

68. From the vagueness of these definitions, Demerits were often cited spitefully. In one instance, Plaintiff observed a Crew Leader cite another worker for "Disrespect to God" (worth 10 points) for involuntary flatulence.

69. Students could not contest or even verify the Demerits recorded against them. Complaining a demerit to Staff frequently resulted in an additional demerit for "Disrespect to Authority," and peering at the recording forms was regularly cited as "Forbidden Area."

70. As a Student, Single, Guide, and Crew Leader, Plaintiff cited and was cited for hundreds of Demerits while he was in the possession of Anchor Academy, including Demerits for refusing to perform labor.

21

71. Acquiring certain amounts of Demerit points in a week-long period, as tallied by Dennis Jr. or a member of Staff, resulted in the imposition of additional punitive methods.

### C. "Character Enhancement Training"

72. Acquiring 30 Demerit points in a week was punished with an extended period of forced physical exercise, called "Character Enhancement Training" or "CET." A CET session would continue for no less than 4-5 hours and would be directed by Staff or a Crew Leader. The substance of CET was unstructured, subject only to the leader's discretion and the requirement that the session consist of no less than 4 hours of nearly continuous, high-intensity physical exertion.

73. Plaintiff was subjected to multiple CET sessions as punishment for receiving 30 or more Demerit points. As a Guide, Plaintiff was also assigned to direct multiple CET sessions, by himself, against other workers, as retribution for their perceived defiance of Anchor Academy.

74. One session Plaintiff was subjected to consisted of about 5 hours of alternating 'push-up' and 'jumping jack' exercises, punctuated only by brief bathroom breaks and water stops granted at the leader's discretion. Another session consisted of about 5 hours of nearly continuous running (an exercise called "Running").

75. Plaintiff had previously been diagnosed with "activity-induced asthma," and being subjected to CET caused him to experience suffocating inflammation in his lungs.

Plaintiff was deprived of asthma medication until Hilderman delivered some to HFI via postal mail, sometime after October 28, 2014.

76. The CET sessions Plaintiff directed as Crew Leader consisted mainly of the Running exercise. The workers Plaintiff was tasked with punishing had endured dozens of CET sessions in the preceding few months, and one worker Plaintiff observed was subjected to CET sessions at least once every week for the entirety of the time Plaintiff was in the possession of Anchor Academy.

77. It was known to Plaintiff that refusing to participate in CET would inevitably result in particularly brutal violence and restraint. In one instance, another worker represented to Plaintiff that their knee had been permanently damaged when they refused to keep running and the leader of CET, another worker, intentionally dropped a concrete block on their sprawled leg.

78. Spencer personally directed some CET sessions, and the knowledge he gained from those sessions has directly or materially benefited his Marathon Training Academy LLC enterprise. Spencer represented to Plaintiff how he had directed CET sessions in extreme weather conditions, for extreme hours and through the night, and had incorporated rope restraints to compel unwilling workers to continue exercising.

### D. "Peanut Butter"

79. Another method of coercion was embodied in a plan of punitive under-nourishment (colloquially called "Peanut Butter").

80. The "Peanut Butter" Diet consisted of the following daily diet (excluding water), and nothing else:

    a. For breakfast: 12oz of raw, whole-grain oats suspended in 8oz of cold milk, unheated;

    b. For lunch and dinner, respectively: Two peanut-butter sandwiches and a serving of fruit.

81. Workers were assigned to the "Peanut Butter" Diet by Dennis Jr., Spencer, or Staff on both a formalized and *ad hoc* basis for infractions deemed beyond the exclusive scope of the Demerit system.

82. Plaintiff was punitively subjected to the "Peanut Butter" Diet on multiple occasions. Additionally, as part of cooking or otherwise preparing hundreds of regular mealtimes for the HFI dormitory, Plaintiff also prepared hundreds of these special meals.

83. All workers in the possession of Anchor Academy were subjected to manual labor nearly every day, and many of the same workers subject to the "Peanut Butter" Plan were also being subjected to CET sessions. As such, when Plaintiff prepared peanut-butter sandwiches, he wanted to provide a meal large enough to be

eucaloric, but this resulted in sandwiches that were thick and uncomfortable to eat. Plaintiff believed a smaller serving would inflict a more harmful caloric and nutritional deficit given the hard labor and/or CET the punished workers were forced to perform.

84. However, some Staff expressed that the purpose of the "Peanut Butter" Diet was to induce hunger to make it sufficiently "punishing." These Staff members would make sandwiches with very little peanut butter or would intervene to prevent Plaintiff from serving more.

85. Plaintiff was severely underweight upon his transfer to Anchor Academy, and in the approximately eleven months he was in their possession, he gained about 50 pounds. As such, Plaintiff does not allege that he was starved in general by Anchor Academy. Nevertheless, the "Peanut Butter" Diet induced in Plaintiff pangs of hunger sufficient to be serious harm.

### III.   Obstruction and Interference with Enforcement

#### A. Background

86. Hilderman permanently removed Plaintiff from the possession of Anchor Academy at some point in July of 2015.

87. In July and August of 2015, Plaintiff labored at the employ of Mac Retail Solutions, Inc., an entity Hilderman had organized and controlled. Hilderman believed he was entitled to this labor, and Plaintiff was not paid for it.

88. Hilderman enrolled Plaintiff in Webster Groves High School ("WGHS"), a public secondary school in Saint Louis County, Missouri, for the 2015-16 school year. Hilderman represented to WGHS administrators that Plaintiff resided with him at his home in Webster Groves, Missouri (hereinafter, the "Webster Residence")

89. When WGHS administrators could not parse what was purported to be an academic transcript provided by HFI, Hilderman met in-person with WGHS administrators and convinced them to recognize transferable education credits from HFI for classes that HFI did not provide.

90. In August or September of 2015, Plaintiff was moved into the Webster Residence to be in his care and the care of defendant Katherine Hilderman ("Halloran"), Hilderman's spouse since 2013, whose public and legal name was Katherine Halloran until 2023.

91. As a condition to living in their home, Hilderman and Halloran attempted to isolate Plaintiff. Plaintiff was expressly forbidden from meeting with counselors employed by WGHS, and from forming relationships with classmates. But Plaintiff nevertheless met with counselors employed by WGHS and formed friendships with peers.

92. In retaliation for breaking their demanded isolation, Hilderman and Halloran maliciously defamed Plaintiff to his peers and the larger community.

93. In a publicly visible Facebook post published prior to March of 2015, Halloran stated that individuals in the possession of Anchor Academy "learn to rape each other."

94. In March or April of 2016, immediately following what Plaintiff maintains was an inebriated battery committed by Halloran against Plaintiff, Hilderman rendered Plaintiff a homeless and unaccompanied youth as defined in 42 U.S.C. 11434a.

95. However, Hilderman was concerned that because Plaintiff was still a child, this separation would raise suspicion with the counselors employed by WGHS with whom Plaintiff had established a rapport. This separation was unlawful in fact.

96. Hilderman met with Plaintiff and informed him that he was no longer welcome at their home. But Hilderman offered Plaintiff the following arrangement:

   a. Hilderman would "allow" Plaintiff to complete high school at WGHS. Hilderman would accomplish this by representing to WGHS administrators that Plaintiff continued to reside with him at the Webster Residence, which was within the WGHS district.

   b. Hilderman would cosign the lease of an apartment, where Plaintiff would reside alone. Hilderman arranged a lease for an apartment located outside the WGHS district through one of his business associates. Hilderman required Plaintiff to use all his compensation from HFI to pay rent on this apartment.

    c. Plaintiff would be employed by the same entity which employed Hilderman (hereinafter, the "Warehouse Employer") and could not be employed elsewhere. Plaintiff worked at least full-time for the Warehouse Employer through the summer of 2016.

    d. Plaintiff could inform no one about Anchor Academy, Halloran's battery, or the fact that Plaintiff was no longer living with Hilderman.

97. Hilderman described the punishment for violation of this arrangement in dire terms, stating, *inter alia*, that he would resort to what he called "Plan Z" if a "child protection case" was ever opened against him or Halloran. Plaintiff believed Hilderman was referring to a plan to return Plaintiff to a geographically isolated location for forced and involuntary labor.

98. In August of 2016, Plaintiff reached 18 years old.

### B. Plaintiff's Police Report

99. On or about October 21, 2016, while Hilderman and Plaintiff were together, Plaintiff came to believe that Hilderman intended to imminently transport them to the possession of Anchor Academy or another trafficking venture.

100. Plaintiff immediately fled from Hilderman and traveled on foot to the Maplewood Police Department in Maplewood, Missouri, where Plaintiff resided alone in the apartment Hilderman had arranged. After attempting to explain his predicament, Plaintiff was referred to the Webster Groves Police Department ("WGPD") in

Webster Groves, Missouri, where Hilderman lived and where Hilderman had rendered Plaintiff a homeless and unaccompanied youth.

101. At WGPD, Plaintiff met with a precinct sergeant. Plaintiff again attempted to explain their predicament. Plaintiff explained, to his best ability, the nature of the Anchor Academy venture, its system of force and coercion, and the threat Plaintiff still perceived from the Anchor Academy venture from Hilderman's knowing participation in it.

102. Plaintiff was particularly terrified by a practice wherein members of the Anchor Academy venture or their hired agents, presumably in coordination with the child's parent or guardian, have assaulted children in their own home and forcibly transported them to Anchor Academy's dormitory facility in a manner simulating an illegal kidnapping. Plaintiff feared that Hilderman and Anchor Academy would not refrain from deploying this method against him as an adult.

103. WGPD opened an investigation with respect to Hilderman and his alleged involvement with Anchor Academy, and with respect to Halloran and her alleged battery against Plaintiff.

### C. Abuse of Legal Process

104. After WGPD contacted Hilderman concerning Plaintiff's report, Hilderman and Halloran worked together to retaliate against Plaintiff through a variety of tortious endeavors, including abuses of legal process and malicious prosecutions.

105. Hilderman and Halloran made false or misleading statements to WGPD investigators to obstruct or interfere with their investigation of Hilderman's alleged trafficking activities.

106. Less than three hours after Plaintiff filed his report, Hilderman, representing himself as Plaintiff's father, filed or caused to be filed a petition on behalf of Plaintiff requesting a 96-hour Imminent Harm Admission to a Mental Health Facility, as permitted under Missouri Revised Statute (RSMo) 632.305. This petition was granted *ex parte*, while Plaintiff was sober and asleep, and Plaintiff was subsequently arrested by law enforcement officers at his apartment.

107. Hilderman maliciously caused this petition to be filed in retaliation for Plaintiff's police report. Hilderman made false or misleading statements to cast the psychological injuries he had inflicted on Plaintiff in a false light, to impugn the credibility of Plaintiff's testimony as a witness to alleged trafficking crimes, and interfere with a police investigation of his alleged trafficking activities.

108. On or about October 24, 2016, Hilderman and Halloran filed or caused to be filed legal petitions for Orders of Protection in the Family Court of the 21st Judicial Circuit of Missouri (hereinafter, "OP Petition(s)"). Halloran also filed an OP Petition on behalf of Child Halloran (pseudonymized). On or about October 25, 2016, Bailey Osburn ("Osburn") also petitioned OP Petition at the direction of Hilderman and Halloran. All these petitions were temporarily granted *ex parte*,

while Plaintiff was still involuntarily admitted to a Mental Health Facility.

109. Osburn was one of Halloran's adult children – Plaintiff's step-brother – who attended WGHS concurrently with Plaintiff. Besides Hilderman and Halloran, Child Halloran and Osburn were the only other residents of the Webster Residence when Plaintiff lived there. Plaintiff had not communicated with Child Halloran nor Osburn by any means since when Hilderman rendered Plaintiff homeless and unaccompanied, more than six months prior to the filing of these Petitions; nor did Halloran or Osburn allege facts to the contrary.

110. These Petitions were filed maliciously, in retaliation for Plaintiff's police report. Hilderman, Halloran, and Osburn each made false or misleading statements in their Petitions. Hilderman and Halloran's objective was to falsely portray Plaintiff as violent to impugn the credibility of Plaintiff's testimony as a witness to alleged trafficking crimes and interfere with a police investigation of Hilderman's alleged trafficking activities.

111. When Plaintiff was released from the Mental Health Facility on October 25, 2016, Plaintiff immediately travelled on foot to WGHS to seek advice from a counselor employed by WGHS. Upon entering the WGHS building, Plaintiff was intercepted by WGHS's on-site WGPD officer, who served Plaintiff with the Orders of Protection and informed Plaintiff that he was thus legally forbidden from occupying the WGHS building while Osburn was in class.

112. Additionally, Hilderman and Halloran reported to certain WGHS administrators that Plaintiff had been attending WGHS classes while residing outside the WGHS school district, and that Plaintiff's enrollment in WGHS was thereby unlawful.

113. For some or all of these actions, Hilderman, Halloran, and Osburn retained the counsel and representation of James P. Carmody, Esq. of Carmody MacDonald P.C.

114. At Plaintiff's *inter partes* hearing, and on recommendation from Child Halloran's Guardian Ad Litem, Halloran's OP Petition on behalf of Child Halloran was dismissed.

115. Plaintiff could not afford an attorney, nor was entitled to one, and so he represented himself and a Consent Order of Protection was negotiated with respect to Hilderman, Halloran, and Osburn. Plaintiff hoped such an Order would have mutually binding effect and protect him. To that end, each Protection Order required that the parties maintain physical separation from the other in all places (excluding, with respect to Osburn, the premises of WGHS to allow Plaintiff to attend school), cease all contact with the other, and not "disparage" the other.

116. To date, no judicial finding or statement of settlement has given substance to any of the adverse claims raised by Hilderman or Halloran in any of their legal actions against Plaintiff.

### D. Malicious Prosecution

117. Following Plaintiff's October 21 police report, Hilderman and Halloran filed and caused to be filed numerous false reports with the WGPD and other police agencies claiming Plaintiff had assaulted them or otherwise violated the Protection Order. These reports caused WGPD or other police agencies to open numerous criminal investigations against Plaintiff, which in only one instance resulted in a criminal arrest.

118. On or about March 1, 2017, following a false report by Hilderman or Halloran, WGPD officers came to the residence where Plaintiff was dwelling (hereinafter, the "Shaw Family Residence") and there arrested him. The WGPD charged and jailed Plaintiff for "Violation of Order of Protection for Adult – 1st Offense" (RSMo 455.085) and "Harassment – 2nd Degree" (RSMo 565.091; effective Jan. 1, 2017), both Missouri misdemeanors.

119. The following morning, on or about March 2, 2017, Plaintiff was released from jail. On January 28, 2025, a representative of the Office of the Prosecuting Attorney for St. Louis County, Missouri stated, "[these] Charges / Warrant(s) were '*REFUSED, (Lack of Evidence)*' by this [O]ffice; thus, no 'formal charges were filed'. …. This case is considered closed." (italics in original).

120. Hilderman and Halloran maliciously caused these charges to be filed, in retaliation for Plaintiff's police report. Hilderman and Halloran made false or misleading

33

statements to WGPD, to falsely impugn Plaintiff's credibility as a witness to alleged trafficking crimes, misdirect WGPD resources away from their other investigations, and interfere with a police investigation of Hilderman's alleged trafficking activities.

### E. McKinney-Vento Act Homeless Youth Liaison

121. WGHS is publicly-funded educational agency whose employees are largely required by law to report reasonable suspicion of child abuse and neglect (*see* RSMo 210.115), and who had employed throughout this time a designated liaison for homeless children and youth as directed by the McKinney-Vento Homeless Assistance Act, 42 U.S.C. § 11432(g)(1)(J)(2) (the "Homeless Coordinator").

122. From the time of Plaintiff's October 21 police report and onward, Hilderman and Halloran made numerous false reports of imminent violence concerning Plaintiff to WGHS administrators, including the Homeless Coordinator.

123. These reports were intended to isolate Plaintiff from law enforcement resources, to terrify the local community in Plaintiff's name, to misdirect law enforcement resources away from their investigation of Hilderman and his alleged trafficking activities, and to impugn the credibility of Plaintiff's testimony as a witness to alleged trafficking crimes.

124. These reports caused WGHS's Homeless Coordinator to delay certification of Plaintiff's status as an unaccompanied youth until April 14, 2017. This delay

34

resulted in a loss of educational opportunities for Plaintiff and the withholding of resources which were intended to aid in the enforcement of trafficking crimes.

### F. Witness Tampering

125. On April 15, 2017, with full permission of WGHS administrators, Plaintiff attended WGHS's Senior Prom. When Plaintiff arrived at the venue, he was immediately intercepted by a WGPD officer, taken to a private area, and strip-searched to his underwear. The WGPD officer represented to Plaintiff that one of Plaintiff's family members – Hilderman's step-mother who was residing in North Carolina – had filed a police report alleging that Plaintiff had been "cutting PVC pipe," with the implication being that Plaintiff was possibly building an explosive device. This report was entirely false, and Hilderman maliciously caused it to be filed with the intent to harass Plaintiff, isolate him from resources intended to aid in the enforcement of trafficking, and misdirect WGPD resources away from their investigation of Hilderman's trafficking activities.

126. After being permitted into the venue (the police officer having found neither explosives nor polyvinyl chloride), Plaintiff was thereafter accosted by a group of Osburn's associates who were upset because Halloran had prevented Osburn's attendance at prom. Halloran had held her son back in protest of WGHS's antidiscrimination policies with respect to designated homeless or unaccompanied students.

127. On April 16, 2017 (Easter Sunday), Hilderman and Halloran directed a coordinated effort to aimed at harming Plaintiff and third parties associated with Plaintiff (hereinafter, the "Easter Campaign")

128. Hilderman published in a publicly visible Facebook post, "Hey Robin Shaw, glad you enjoyed prom last night. Thanks for pestering Bailey's friends and my family members online, again, at 2am. They want nothing to do with you – but you know that already. What's Next?" Osburn then republished this text on his own Facebook page. This post marked the first time that Plaintiff had ever been referred to with the surname "Shaw," which was the name of the family that Plaintiff had been residing with as an unaccompanied youth. Even after every harm Hilderman had inflicted on them, Plaintiff felt particularly shattered by this act of public disownment.

129. After some time on that same day, Hilderman published the following in another publicly visible Facebook post:

> "I've heard that when Robert/Robin Hilderman/Shaw was asked a few weeks ago about the name of his girlfriend, his response was '[Highschool Doe.]' Was this another PTSD episode where he was mentally trapped in his pre-Webster past, or just another lie? I vote lie, only because I have known him longer that [sic] anyone else. At this point perhaps his girlfriend is asking, What's Next?"

130. Highschool Doe (anonymized) was a woman still in high school and a brief classmate of Plaintiff's in 2013, who was living in St. Louis County, Missouri.

36

Given that Hilderman, who was 41 years old, had made malicious statements concerning two high school friends of Plaintiff's without reason or provocation, many people close to Plaintiff indeed asked themselves, "What's Next?"

131. After some time on that same day, Halloran published the following in a post to "Webster Groves Community Connect," a Facebook Group message board which at the time was frequented by local parents and WGHS administrators for WGHS-related updates:

> Why my son [Bailey Osburn] did not go to WGHS 2017 Prom....
>
> • Another WGHS student (who ceased attending school in late 2016) has assaulted two of my children, strangled my husband, threatened to "beat the f-- out of me", "remove (my youngest son) from me", "drain us financially", and "kill everyone at the high school".
>
> • This student was found in possession of combat knives (shown below), assumed to be stolen from his previous employer.
>
> • This student has recently professed to be "cutting PVC pipe".
>
> • My family has continued to be a direct target of hacking, cyber stalking, harassment, and false allegations of abuse, imprisonment, and neglect, for the past six months.
>
> • WGHS and "the courts" interpret protection order 16SL-PN05431 [Osburn's and Plaintiff's Consent Order] in way that enables the perpetrator's freedom at the expense of the safety of all other students.
>
> • My family has been told by WGHS in no uncertain terms, that the perp mentioned above will absolutely be allowed to attend and participate in Turkey Day, prom, awards night, graduation, and the school sponsored graduation after party. I do not feel that

my son is safe at any of the above functions due to the words expressed and actions taken by the one who seems to hate us so much. Which is why my kind, sweet, loving, and "hands down" AWESOME SON did not go to WGHS Prom 2017.

• The letter shown below from [the WGHS Principal] makes me want to either laugh or vomit.

• Is the WGHS student body divided over the lies the perp has told? YES

• Do we feel that proper precautions are being taken by WGHS to avoid tragedy? NO

• Is my family afraid to sleep at home tonight and do we consider moving? YES.

• Are we concerned that moving will not adequately protect us from said perpetrator? YES.

• Am I more concerned for the safety of my family and community at large than I am for the legal and/or social ramifications of this post? YES

• DOES MY SON WANT TO, AND HAS HE EARNED THE RIGHT TO (12 YEARS OF EXCELLENT BEHAVIOR, DECENT GRADES EVEN WITH AN IEP) PARTICIPATE IN THE GRADUATION CEREMONY & FOLLOWING PARTY WITHOUT FEAR AND DRAMA????? YES!!!!!!!!!!

We are exhausted and simply do not know where to turn. Feel free to reach out to me if you have questions. Feel free to call the high school if you are concerned.

(ellipses, emphases, and parentheticals in original; clarifying brackets added).

Attached to this post, Halloran attached the following picture (hereinafter, the "Knife Photo"):



132. Hilderman or Halloran staged the Knife Photo themselves, then Halloran falsely represented it as evidence taken as part of a lawful investigation. The knife shown in the photo appears similar to knives sold by the Warehouse Employer, where Hilderman was still employed and where Plaintiff had been absent since at least October 21, 2016.

133. When numerous members of the community responded with alarm and asked to know the identity of "the perpetrator" Halloran was referencing, Halloran replied: "I'm not supposed to make 'disparaging remarks' about him. If you are concerned and want to know his identity, call the police department."

134. Shortly after acknowledging her lawful obligation to not disparage Plaintiff, Halloran published a second post to the same forum containing Plaintiff's full

39

name, facial picture, and other identifiers, stating, "Since lots of people are asking …, see below for your new Webster buddy. …. Enjoy." (ellipses added).

135.  These statements by Halloran, which appropriated Plaintiff's name and likeness to make a terroristic threat, resulted in numerous alarmed reports to the WGPD and WGHS administrators.

136.  About 10 minutes after Halloran doxed Plaintiff in this manner, another one of Halloran's adult children, Oliver Halloran, published the following in a publicly visible Facebook post:

> Since the end of 2016, my family has been constantly terrorized by my step-brother (Robert - or, "Robin," - Hilderman). From the beginning of all of this, he has lashed out in violence towards us and has made threats towards the Webster Groves community at large - examples in the attached post.
>
> Anyway, the main reason for this post is to inform any friends and family who are not yet aware of this predicament and to request that if he has reached out to you, to alert me/other members of my family.
>
> If you have a free moment and are interested at all, the link to a better explanation can be found below.
>
> Thank you for your time[.]

Oliver Halloran (@oosburn), FACEBOOK (Apr. 16, 2017, at 20:44 CDT), https://www.facebook.com/oosburn/posts/pfbid0SYfLW4P9tXSgAYt5SL89Bug Xgm29YMVPLbxGuhihY2JctvkiuFeDMNmojYNEYg2vl (last visited May 23, 2026).

137. In a comment to this post, Oliver Halloran shared a link to Katherine Halloran's earlier post in Webster Groves Community Connect. Though Katherine's posts have been deleted since 2017, Oliver's post remains publicly visible to this day and no examples of violence or threats nor any explanation for Oliver's ongoing defamation have been provided since that time.

138. Hilderman and Halloran directed the Easter Campaign in retaliation for WGHS's Homeless Coordinator's determination that Plaintiff was an unaccompanied youth, and was intended to isolate Plaintiff from resources appropriated for the enforcement of trafficking crimes, impugn the credibility of Plaintiff's testimony as a witness to alleged trafficking crimes, and misdirect police resources away from an investigation of Hilderman's alleged trafficking activities.

### CAUSES OF ACTION

### COUNT ONE
**Civil Action under 18 U.S.C. §§ 1595(a) and 2255 for
Violations of TVPRA – Forced Labor**
*18 U.S.C. § 1589(a)*
(Against All Defendants excluding Katherine Hilderman)

139. Plaintiff repeats and realleges all the foregoing allegations as if fully set forth herein.

140. With respect to each of Defendants Harvest Foundation, Inc., Vanduser Gin Company, Dennis L. McElwrath, Trevor Spencer, and Walter Hilderman IV: While Plaintiff was a child, Defendant knowingly provided or obtained the labor or

services of Plaintiff by means of force, threats of force, physical restraint, or threats of physical restraint

141. With respect to each of Defendants Harvest Foundation, Inc., Vanduser Gin Company, Dennis L. McElwrath, Trevor Spencer, and Walter Hilderman IV: While Plaintiff was a child, Defendant knowingly provided or obtained the labor of services of Plaintiff by means of serious harm or threats of serious harm, including physical injury, deprivation of medical care, and psychological coercion.

142. With respect to Defendant Walter Hilderman IV: Defendant knowingly provided or obtained the labor or services of Plaintiff by means of abuse or threatened abuse of law or legal process, including abuse of the right of parents to the control, care, and custody of their legal children.

143. With respect to each of Defendants Harvest Foundation, Inc., Vanduser Gin Company, Dennis L. McElwrath, Trevor Spencer, and Walter Hilderman IV: While Plaintiff was a child, Defendant knowingly provided or obtained the labor or services of Plaintiff by means of a scheme, plan, or pattern intended to cause Plaintiff to believe that, if he did not perform such labor or services, he would suffer serious harm or physical restraint.

**COUNT TWO**
**Civil Action under 18 U.S.C. § 1595(a) for**
**Violations of TVPRA – Involuntary Servitude**
*18 U.S.C. § 1584(a)*
(Against All Defendants excluding Katherine Hilderman)

144. Plaintiff repeats and realleges all the foregoing allegations as if fully set forth herein.

145. With respect to each of Defendants Harvest Foundation, Inc., Vanduser Gin Company, Dennis L. McElwrath, Trevor Spencer, and Walter Hilderman IV: While Plaintiff was a child, Defendant knowingly held Plaintiff to a condition wherein Plaintiff was forced to provide labor or services for Defendant by means of physical injury, physical restraint, abuse of law or legal process, or threats thereof.

**COUNT THREE**
**Civil Action under 18 U.S.C. § 1595(a) for**
**Violations of TVPRA – Peonage**
*18 U.S.C. § 1581(a)*
(Against Defendants Harvest Foundation, Inc. and Walter Hilderman IV)

146. Plaintiff repeats and realleges all the foregoing allegations as if fully set forth herein.

147. With respect to each of Defendants Harvest Foundation, Inc. and Walter Hilderman IV: While Plaintiff was a child, Defendant knowingly held or returned Plaintiff to a condition wherein Plaintiff was compelled to work in service of some debt imposed on Plaintiff by Defendant, including debts for Plaintiff's childhood care.

43

## COUNT FOUR
**Civil Action under 18 U.S.C. §§ 1595(a) and 2255 for
Violations of TVPRA – Trafficking with Respect to Peonage, Involuntary
Servitude, or Forced Labor**
*18 U.S.C. § 1590(a)*
(Against All Defendants excluding Katherine Hilderman)

148. Plaintiff repeats and realleges all the foregoing allegations as if fully set forth herein.

149. With respect to each of Defendants Harvest Foundation, Inc., Vanduser Gin Company, Dennis L. McElwrath, Trevor Spencer, and Walter Hilderman IV: While Plaintiff was a child, Defendant knowingly recruited, harbored, transported, provided, or otherwise obtained Plaintiff for labor compelled by means of involuntary servitude, peonage, or forced labor.

## COUNT FIVE
**Civil Action under 18 U.S.C. §§ 1595(a) and 2255 for
Violations of TVPRA – Benefitting Financially from Forced Labor, Peonage,
Involuntary Servitude, or Trafficking in Persons**
*18 U.S.C. §§ 1589(b), 1593A*
(Against All Defendants excluding Katherine Hilderman)

150. Plaintiff repeats and realleges all the foregoing allegations as if fully set forth herein.

151. With respect to each of Defendants Harvest Foundation, Inc., Vanduser Gin Company, Dennis L. McElwrath, Trevor Spencer, and Walter Hilderman IV: Defendant knowingly benefited, financially or by receiving something of value,

from participation in a venture which provided or obtained the labor or services of Plaintiff, while Plaintiff was a child, by means of forced labor.

152. With respect to each of Defendants Harvest Foundation, Inc., Vanduser Gin Company, Dennis L. McElwrath, Trevor Spencer, and Walter Hilderman IV: Defendant knowingly benefited, financially or by receiving something of value, from participation in a venture which provided or obtained the labor or services of Plaintiff, while Plaintiff was a child, by means of peonage, involuntary servitude, or trafficking in persons.

**COUNT SIX**
**Civil Action under 18 U.S.C. §§ 1595(a) and 2255 for**
**Violations of TVPRA – Obstruction or Interference with Enforcement of the**
**TVPRA with Respect to Peonage, Involuntary Servitude, or Trafficking in**
**Persons**
*18 U.S.C. §§ 1581(b), 1584(b), 1590(b)*
(Against Defendants Walter Hilderman IV and Katherine Hilderman)

153. Plaintiff repeats and realleges all the foregoing allegations as if fully set forth herein.

154. With respect to each of Defendants Walter Hilderman IV and Katherine Halloran: Defendant knowingly obstructed or interfered with the lawful enforcement of the TVPRA with respect to trafficking in persons, by means including the giving of false statements to law enforcement personnel and abuses and threatened abuses of law and legal processes.

45

155.  With respect to each of Defendants Walter Hilderman IV and Katherine Halloran: Defendant knowingly obstructed or interfered with the lawful enforcement of the TVPRA with respect to peonage or involuntary servitude, by means including the giving of false statements to law enforcement personnel and abuses and threatened abuses of law and legal processes.

**COUNT SEVEN**
**Civil Action under 18 U.S.C. §§ 1595(a) for**
**Violations of TVPRA – Conspiracy to violate the TVPRA with Respect to Peonage, Forced Labor, or Trafficking in Persons**
*18 U.S.C. § 1594(b)*
(Against all Defendants)

156.  Plaintiff repeats and realleges all the foregoing allegations as if fully set forth herein.

157.  With respect to each of Defendants Harvest Foundation, Inc., Vanduser Gin Company, Dennis L. McElwrath, Trevor Spencer, and Walter Hilderman IV: Defendant conspired with another to violate the TVPRA with respect to peonage or forced labor.

158.  With respect to each of Defendants Harvest Foundation, Inc., Vanduser Gin Company, Dennis L. McElwrath, Trevor Spencer, Walter Hilderman IV, and Katherine Halloran: Defendant conspired with another to violate the TVPRA with respect to trafficking in persons or the enforcement of same.

46

## COUNT EIGHT
### Civil Action under 18 U.S.C. §§ 1595(a) for
### Violations of TVPRA – Attempted Violations of the TVPRA with Respect to Peonage, Involuntary Servitude, Forced Labor, or Trafficking in Persons
*18 U.S.C. § 1594(a)*
(Against all Defendants)

159. Plaintiff repeats and realleges all the foregoing allegations as if fully set forth herein.

160. With respect to each of Defendants Harvest Foundation, Inc., Vanduser Gin Company, Dennis L. McElwrath, Trevor Spencer, and Walter Hilderman IV: Defendant attempted to violate the TVPRA with respect to peonage, involuntary servitude, or forced labor.

161. With respect to each of Defendants Harvest Foundation, Inc., Vanduser Gin Company, Dennis L. McElwrath, Trevor Spencer, Walter Hilderman IV, and Katherine Halloran: Defendant attempted to violate the TVPRA with respect to trafficking in persons or the enforcement of same.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Robin Shaw respectfully requests that this Court:

1. Enjoin each of Defendants Harvest Foundation Inc., Vanduser Gin Company, Dennis L. McElwrath, Trevor Spencer, Walter Hilderman IV, and Katherine Hilderman from further violating the Trafficking Victims Protection Reauthorization Act.

47

2. Declare that each of Defendants Harvest Foundation Inc., Vanduser Gin Company, Dennis L. McElwrath, Trevor Spencer, and Walter Hilderman IV violated 18 U.S.C. §§ 1581, 1584, 1589, 1590, and 1593A by knowingly subjecting Plaintiff to peonage, involuntary servitude, forced labor, and trafficking in persons, and by benefiting financially from this conduct.

3. Declare that each of Defendants Walter Hilderman IV and Katherine Hilderman violated 18 U.S.C. §§ 1581, 1584, and 1590 by obstructing, attempting to obstruct, and interfering with the enforcement of the Trafficking Victims Protection Reauthorization Act with respect to peonage, involuntary servitude, and trafficking in persons.

4. Award Plaintiff Robin Shaw compensatory damages against each of Defendants Harvest Foundation Inc., Vanduser Gin Company, Dennis L. McElwrath, Trevor Spencer, Walter Hilderman IV, and Katherine Hilderman, in an amount to be determined at trial, for physical, emotional, and economic harms suffered as a result of Defendants' violations of the Trafficking Victims Protection Reauthorization Act.

5. Award Plaintiff Robin Shaw punitive damages against each of Defendants Harvest Foundation Inc., Vanduser Gin Company, Dennis L. McElwrath, Trevor Spencer, Walter Hilderman IV, and Katherine Hilderman, as permitted by 18

48

U.S.C. §§ 1595 and 2255, for Defendants' willful, malicious, and egregious violations of the Trafficking Victims Protection Reauthorization Act.

6. Award Plaintiff Robin Shaw reasonable attorneys' fees, expert witness fees, and costs of suit against Defendants Harvest Foundation, Inc., Vanduser Gin Company, Dennis L. McElwrath, Trevor Spencer, Walter Hilderman IV, and Katherine Hilderman, as authorized by Federal Rule of Civil Procedure 54 and 18 U.S.C. § 2255.

7. Grant Plaintiff Robin Shaw such further relief as the Court may deem just and proper.

Respectfully Submitted,

/s/ Robin Shaw

Robin Shaw, *pro se*
479 Ridge Avenue
St. Louis, Missouri 63119
T: 702-830-1124
E: email@robinshaw.me